**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2884-24

KHALIF JAMES,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

Submitted May 21, 2026 – Decided July 21, 2026

Before Judges Mawla and Marczyk.

On appeal from the New Jersey Department of Corrections.

Khalif James, self-represented appellant.

Jennifer Davenport, Attorney General, attorney for respondent (Leo R. Boerstoel, Deputy Attorney General, on the brief).

PER CURIAM

Khalif James, an inmate in the State's correctional system, appeals from the New Jersey Department of Corrections' (DOC) January 8, 2025 final agency decision denying his request for a transfer to a halfway house through the Residential Community Reintegration Program (RCRP).[1]  We affirm.

I.

In 1998, James was sentenced, following a jury trial, to a life term with a thirty-year period of parole ineligibility for murder, robbery, and unlawful possession of a weapon.  He is currently incarcerated at Bayside State Prison (BSP) and will not be parole eligible until January 2027.

In July 2024, James applied to be transferred to an RCRP facility.  The application stated:  "The [DOC] may assign inmates to community programs based upon the inmate's treatment needs and the availability of bed space."  It also noted:  "Inmate applicants who are approved by the Institutional Classification Committee ([ICC]) for the [RCRP] shall also be approved for the Mutual Agreement Program [(MAP)].  However, this approval shall be contingent upon inmates meeting the eligibility criteria for the MAP and subject to acceptance by the program."

---

[1]  The program was formerly known as the Residential Community Release Program.

A-2884-24

In September 2024, the ICC at BSP approved James's application. In October, the DOC's Office of Community Programs (OCP) denied his application based on the length of time remaining on his sentence. The denial explained James did "not have a max[imum] date, which is a consideration utilized to determine appropriateness for RCRP placement." It also explained his January 27, 2027 parole eligibility date (PED) "is not a definitive release date[,] and a parole denial could result in [him] remaining in an RCRP placement for the indeterminat[e] time remaining on [his] sentence." Further, based on the length of time remaining on his sentence, the OCP found it was in his "best interest to continue institutional programming," noting "RCRPs have limited bed space and are designed for concentrated reintegration programming and employment[,] rather than long-term incarceration."

James subsequently wrote to the Office of the Governor, the New Jersey State Parole Board (Board), the DOC, and the OCP, arguing the OCP's denial of his transfer application "based solely on the maximum portion of [his] sentence" was "unconstitutional" and amounted to a denial of "the only pre-parole reentry plan available to [him]." On January 8, 2025, the OCP responded via letter, maintaining it denied James's RCRP application based on his remaining sentence length, which is "a factor that is applied uniformly to all cases." It

3

reiterated he does "not have a maximum date, which is a minimum consideration in the review and approval process," and his PED "is not a release date." The OCP explained: "The procedure of reviewing the length of a sentence is not only applied to incarcerated persons . . . with [l]ife sentences[,] but to all applications in which the maximum expiration is more than five . . . years past the date of the application." Pursuant to N.J.A.C. 10A:20-4.5, "the expectation is that an incarcerated person . . . has [thirty] months remaining to be served on their sentence" to be eligible for participation in the RCRP.

The OCP also explained "'pre-parole reentry services' are not limited to placement outside the correctional facility" but also include educational and rehabilitative opportunities available within the facility, noting James had been offered referrals to reentry and educational services in 2011 when he met with staff to complete his "risk and needs assessment." The OCP informed James he may be considered for an RCRP placement once he has an established release date and offered him the opportunity to discuss other programs available to him.

In a March 25, 2025 letter, the DOC responded to James's February 19 correspondence requesting the OCP reconsider its decision. The letter advised the OCP's January 8, 2025 letter constituted the agency's final decision.

A-2884-24

James argues the OCP acted arbitrarily in denying his RCRP application based on reasons not listed within the State's administrative code, including his maximum expiration date exceeding five years and hypothetical parole extensions, despite the ICC's initial approval and his meeting the program's eligibility requirements. He contends the OCP arbitrarily changed its placement standard concerning maximum expiration dates to now deny any applications with a date exceeding five years, when it previously only provided such dates "minimum consideration" in its review and approval process. James claims the OCP's new placement standard violates the doctrine of fundamental fairness and his due process rights. He also asserts "indeterminate" placements at an RCRP may be remedied pursuant to N.J.A.C. 10A:20-4.16, which provides, in part, an "inmate shall be returned to the correctional facility for assignment" when their PED "has been extended[] and . . . would extend beyond the [thirty] months of parole eligibility remaining to be served."

James further argues the OCP misconstrued N.J.A.C. 10A:20-4.5 because it failed to find his PED was a "release date"[2] falling within the thirty-month period during which incarcerated persons become eligible for RCRP placement.

---

[2] James acknowledges his PED is a "tentative" release date.

He posits incarcerated persons with life sentences will always be denied RCRP placement, as their maximum dates will always exceed the OCP's five-year requirement for approval. He contends the OCP's evaluation process irrationally prioritized his sentence length over his character, culpability, therapeutic and educational achievements, and the comparative culpability of his co-defendant, in violation of his due process rights. In support of this contention, James highlights his participation in numerous educational, rehabilitative, conflict-resolution, and trade programs, including obtaining his associate's degree and serving as president of "the Lifers' Group."

Additionally, James asserts no DOC or Board staff members have engaged with him regarding an individualized reentry plan, as required under N.J.S.A. 30:1B-6.10, as such plans are only offered through RCRP placements. He argues the DOC's failure to provide him notice and a hearing prior to depriving him of his statutory right to an individualized reentry plan violated his constitutional rights. Contrary to the OCP's contention, James claims he did not receive any "pre-parole reentry services" in 2011 and, even if he did, those services would have been offered fourteen years ago, and thus his individualized reentry plan was never updated pursuant to N.J.S.A. 30:1B-6.10. Although he concedes "reentry services offered at the RCRP is not a right" but "a privilege,"

James "believes . . . he 'earned' the opportunity to take . . . advantage of the transitional services."

Our review of an administrative agency's decision is limited. Newman v. Bd. of Rev., 434 N.J. Super. 483, 488 (App. Div. 2014). We will disturb the DOC's decision "only if it is arbitrary, capricious[,] or unreasonable," or unsupported "by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980). This is because the Commissioner has "complete discretion" to determine an inmate's placement and custody status. Smith v. N.J. Dep't of Corr., 346 N.J. Super. 24, 29 (App. Div. 2001). Nonetheless, we will find an abuse of discretion "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). "[I]t is a fundamental of fair play that an administrative judgment express a reasoned conclusion . . . [which] requires evidence to support it and findings of appropriate definiteness to express it." N.J. Bell Tel. Co. v. Commc'ns Workers of Am., 5 N.J. 354, 375 (1950) (internal citation omitted).

A-2884-24

An inmate does not have a constitutionally protected liberty interest in the decision where to be placed within a correctional institution by a State's penal authority. See Sandin v. Conner, 515 U.S. 472, 484, 486 (1995). "There is no constitutionally protected interest in reduced custody status." Moore v. Dep't of Corr., 335 N.J. Super. 103, 110 (App. Div. 2000). Further, inmates in a halfway house remain in institutional confinement. Shabazz v. N.J. Dep't of Corr., 385 N.J. Super. 117, 125 (App. Div. 2006). And, we have specifically held "halfway house placement does not involve a liberty interest." Trantino v. N.J. State Parole Bd., 296 N.J. Super. 437, 464 (App. Div. 1997), aff'd as modified, 154 N.J. 19 (1998).

Rather, in such instances, constitutional due process safeguards are necessary only if a modification of an inmate's custody status "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. The DOC's decision to deny an inmate's request to be transferred to a halfway house does not reflect an "atypical" or "significant hardship." See Shabazz, 385 N.J. Super. at 123 (quoting Sandin, 515 U.S. at 484).

The DOC, however, has circumscribed the discretion over inmate placement by adopting regulations that delegate such decisions to various

agency officials, subject to prescribed factors. See Cnty. of Hudson v. Dep't of Corr., 152 N.J. 60, 70 (1997) ("[A]n administrative agency ordinarily must enforce and adhere to, and may not disregard, the regulations it has promulgated."). Specifically, with respect to RCRP placement, an extensive administrative code has been promulgated, which vests an initial decision in the prison's ICC. N.J.A.C. 10A:20-4.10(a).

As a general matter, an ICC is responsible for, among other duties, "[r]eview of inmate applications for change in custody status." N.J.A.C. 10A:9-3.1(a)(3). With respect to RCRP participation specifically, initial approval by the ICC is dependent upon: the "general eligibility criteria" set forth in N.J.A.C. 10A:20-4.4; the "inmate's present and/or previous parole violation(s)"; the "inmate's previous failure in an RCRP"; and/or the "decision-making criteria" set forth in N.J.A.C. 10A:9-3.3, which apply generally to any ICC decision on a custody status. N.J.A.C. 10A:20-4.10(a).

The RCRP-specific criteria are set forth in N.J.A.C. 10A:20-4.4. They include: (1) full minimum classification; (2) risk to public safety; (3) a psychological evaluation; (4) medical and dental certification; (5) "a satisfactory overall correctional facility adjustment with recommended educational and therapeutic program participation"; (6) completion of the application "for those

inmates who are interested in participating"; (7) approval of that application by the ICC "as the initial step in the approval process"; (8) approval by the RCRP Notification Committee; (9) review by the Assessment and Treatment Center; and (10) "initial approval based on the criteria set forth by the [ICC] and [OCP] Classification and Assignment Unit." N.J.A.C. 10A:20-4.4.

In addition, the regulations establish time frames for eligibility. N.J.A.C. 10A:20-4.5. Specifically, N.J.A.C. 10A:20-4.5, in pertinent part, provides:

> (b)    In addition to the general eligibility criteria at N.J.A.C. 10A:20-4.4, candidates for [RCRP]s who have not been convicted of a sexual offense as defined at N.J.S.A. 30:4-91.8 or an arson offense and who do not demonstrate an undue risk to public safety shall be eligible within the time frames established at (c) below of:
>
> 1.    An established parole date;
>
> 2.    An expiration of maximum sentence;
>
> 3.    An actual [PED] established by the . . . Board; or
>
> 4.    An anticipated parole date, as established by the . . . Board, for inmates serving indeterminate sentences.
>
> (c)    Candidates are eligible for participation in a[n RCRP] when the candidate also meets the following time criteria and employment verification criteria:
>
> 1.    Has less than [thirty] months remaining to be served and is determined by the

10

Commissioner, or designee, to be appropriate for participation in a[n RCRP];

2.   Has more than [sixty] days, but less than [thirty] months, remaining to be served and is determined by the Commissioner, or designee, to be appropriate for participation in an RCRP; or

3.   Has applied for or provided proper documentation, maintained by the Office of Programming and Supportive Services, that will be required for employment eligibility in the [RCRP]'s employment phase.

Further, a prison administrator may overrule the ICC's approval of an RCRP application "when the . . . administrator has information that was not available to the [ICC] when the . . . application was approved." N.J.A.C. 10A:20-4.10(c). The administrator, however, may not overrule the ICC's disapproval of an application. N.J.A.C. 10A:20-4.10(b).

After the ICC makes its initial decision, the regulatory scheme empowers and affirms the OCP's authority over RCRP participation, including, as is before us, overriding an ICC decision to place an inmate in an RCRP. See, e.g., N.J.A.C. 10A:20-4.2(b) ("[the OCP] shall make the final recommendation for [RCRP] participation for all inmates"); N.J.A.C. 10A:20-4.10(e) (stating an inmate shall be notified "in writing, of the status of the inmate's application to a[n RCRP] only upon final approval by the [OCP]"); N.J.A.C. 10A:20-4.12(h)

("the [OCP] shall have final approval or disapproval authority for the participation of all inmates in the [RCRP]").  We have also noted, "under New Jersey law, a reduction in custody status is a matter of privilege, not of right." Smith, 346 N.J. Super. at 30; see also N.J.A.C. 10A:9-4.2.

Guided by these principles, we conclude there is no basis to disturb the DOC's decision.  The OCP appropriately exercised its discretion in denying James admission to the RCRP based on the remaining length of his sentence and lack of a definitive release date.  The regulations governing participation in the RCRP vest final approval authority in the OCP and contemplate the OCP's consideration of an inmate's sentence length and release dates as criteria for it to consider in deciding whether to approve an application.  See N.J.A.C. 10A:20-4.4, -4.5, -4.10, -4.12(h).

James did not have a "maximum date" and his PED was not a release date; therefore, he did not meet the criteria set forth in N.J.A.C. 10A:20-4.5.  The OCP's application of the pertinent regulations to all applicants, including those serving life sentences like James, does not constitute an arbitrary, unreasonable, or capricious exercise of its discretion.  See Henry, 81 N.J. at 579-80.  It did not violate principles of fundamental fairness or due process in denying James's application as inmates, including James, do not have a right to a particular

custody status or to placement in a particular facility, such as a halfway house. See Sandin, 515 U.S. at 484, 486; Moore, 335 N.J. Super. at 110; Trantino, 296 N.J. Super. at 464; Rocca v. Groomes, 144 N.J. Super. 213, 215 (App. Div. 1976) ("There is no denial of due process when such transfer is accomplished without a prior hearing."). The DOC reasonably considered the availability of bed space for the program in light of the remaining length of James's sentence.

The record belies James's contention he did not receive sufficient pre-parole reentry services. The RCRP is not the only way for inmates to receive individualized reentry plans. As the OCP explained to James in its decision, "'pre-parole reentry services' are not limited to placement outside the correctional facility." (Italics omitted). Rather, those services can also include educational and rehabilitative opportunities available within a facility. Accordingly, the applicable regulations and substantial credible evidence in the record support the DOC's decision.

To the extent we have not specifically addressed any remaining arguments James raised, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-2884-24